LOTTINGER, Judge.
This is a suit for personal injuries brought by the tutrix of the minor child Louis Legro, who was struck by an automobile insured by defendant, Delta Fire and Casualty Company. The petition alleges that the accident occurred at about 4 o’clock p. m. on June 3, 1955 in the City of Baton Rouge on Nicholson Drive, a four lane highway running north and south with a neutral ground in the center, near its intersection with Oklahoma Street. It is set forth that the child had crossed the eastern portion of the highway and neutral ground and had entered the western lane of traffic when he was struck by the 1951 Oldsmobile automobile insured by defendant and driven by Edgar Joseph Dayries, Jr. Negligence is charged against Dayries in failing to keep a proper lookout, failing to have his vehicle under control, in driving at an excessive rate, in failing to give warning and in failing to change the course of his vehicle or to take other precautions to avoid the accident.
The defendant’s answer admitted coverage but denied the other material allegations of the petition alleging that the accident was due solely to the negligence of the child in running from behind shrubbery on the neutral ground into the path of the automobile. Alternatively, contributory negligence was pleaded by way of defense.
Following trial on the merits in the court below judgment was rendered in favor of defendant; hence this appeal by the plaintiff.
The driver of the automobile, Dayries, gave the following version of how the accident occurred:
“Q. Which way were you traveling, Edgar? A. I was traveling toward L.S.U.
“Q. On what street? A. On Nicholson Drive.
“Q. Now what part of Nicholson Drive were you on? A. I was in the right-hand lane going south and I pulled over into the left-hand lane.
“Q. As you approached Oklahoma Street what lane were you in ? A. As I approached Oklahoma Street I was in the left-hand lane.
“Q. Near the neutral ground? A. Near the neutral ground.
“Q. At about what rate of speed were you traveling? A. Roughly I would say thirty-five or forth miles an hour.
“Q. Did you observe any people in or about the street in that vicinity *745 as you approached Oklahoma Street? A. No, I didn’t.
“Q. Did you see any children at all in the vicinity? A. No, I didn’t.
“Q. Did you see anyone on the neutral ground? A. No, I didn’t.
“Q. Did you see anyone on the west side of Nicholson? A. No, I didn’t. Now are you talking about all along ?
“Q. No, as you — say within a block of the intersection? A. No, I didn’t see anybody in there.
“Q. What is the first person that you saw or where was the first person that you saw as you approached the intersection ? A. As I approached the intersection there was a little colored boy that ran out in front of the car.
“Q. Where did he come from? A. It looked like he came from the neutral ground on the north side of the neutral ground, that would be toward the city. It looked as though he might have been playing out there, hiding behind those little shrubs. They have been cut since the accident happened, they were a lot higher.
“Q. Now you say north side. North of the intersection, north of Oklahoma? A. On the north side, that’s right.
“Q. Of Oklahoma Street? A. Of Oklahoma Street.
“Q. Now that would be the south end of the neutral ground in the middle of Nicholson? A. That’s right.
“Q. Now where was your automobile when you first saw this boy? A. My automobile was in the left-hand lane.
“Q. How far from Oklahoma? A. I imagine it must have been about, oh roughly say nine, ten or fifteen feet maybe, something like that. It was right practically on top of the car you might say. It was right there.
“Q. This child came from what appeared to you to be coming from behind the shrubbery? A. That’s right.
“Q. And which direction did he travel in ? A. He was traveling to the west.
“Q. Across Nicholson Drive? A., Across Nicholson Drive.
“Q. And what did you do ? A. As soon as I saw him I slammed on the brakes and cut the car very sharply to the right.
“Q. Then what happened ? A. After that the car hit the loose gravel and debris that was out on Nicholson Drive from Oklahoma Street and went into a spin and the car stopped when it got to the neutral ground and bounced on the curb, the front bumper and fender were caught on the guy wire.
“Q. With reference to the child,, what happened ? A. Well I remember seeing him and I slammed the brakes on and after that I didn’t see the child any more because the car went into a spin.
“Q. In which direction was the car facing when it came to rest ? A. It was facing toward thp north, that would be back toward the city.
“Q. As I understand it spun around and came to rest partly up on and partly up against the west curb of Nicholson, is that right ? A. That’s right.”'
* * =K * 4= *
“Q. Now were you skidding at the time you hit the boy ? A. Yes, I was.
“Q. You were skidding? A. I was skidding.
“Q. Do you remember if you skidded very much before you hit the *746 boy? A. No, I did not skid very much before I hit him.
“Q. About how much, do you think ? A. About two, maybe three feet.”
* * * * * *
“Q. Edgar, I understand that you say you saw this boy as you say, dart out, from the neutral ground right in the path of your automobile, is that correct? A. That’s correct.
“Q. Now did you see him from the moment he left the neutral ground or did you see him when he came from behind the shrub or just at what point did you see him ? A. I saw him as he came from behind the shrub. The reason why I say he darted out in front of me was because he was running, that was what gave me the impression he was playing out there.
“Q. And you actually saw him as he came from behind the shrubbery? A. Right.
“Q. And was he moving fast or slow or just normal? A. No, he was moving fast, he was running.
“Q. Did you do everything that you possibly could from the moment that you saw him come from behind the shrub, when you first saw him, to avoid hitting him ? A. I did.”
Doctor John A. Thompson, head of the Department of Foreign Languages at Louisiana State University, testified that he had ■followed the Dayries car at a distance of .about three-quarters of a block to its rear for several blocks. He stated that he was in the right or slow lane and that Dayries was in the left or passing lane when the accident •occurred. He stated further that he was proceeding at a rate of about thirty or thirty five miles per hour and estimated the speed •of Dayries as being about the same as his. He did not see the child who was injured until after the accident when he stopped and found him lying on the ground on the western side of the highway. He did see one young colored boy cross from the neutral ground to the west side of Nicholson Drive just behind the Dayries car as it began skidding.
The testimony of Dr. Thompson was corroborated by that of his wife, who was riding with him.
The accident was investigated by two police officers who measured the skid marks left by the Dayries car and who even test-skidded the car. As a result, the testimony of both was that Dayries was traveling at a rate of 44 miles per hour before the accident. The speed limit in the area was 45 miles per hour.
Two other persons testified who were present when the accident occurred but their testimony fails to indicate the speed at which the Dayries car was being driven.
The trial judge, in' his written reasons for judgment, arrived at the following conclusion :
“Accordingly, I am of the opinion that because of the positive testimony of Mr. Dayries and of Doctor and Mrs. Thompson that Mr. Dayries was not traveling at an excessive rate of speed, this accident resulted when young Le-gro darted into the path of the Dayries vehicle when said vehicle, being driven in a proper and prudent manner by Mr. Dayries, was in such close proximity to the boy that there was nothing the driver, Mr. Dayries, or any other cautious driver could have done to have avoided striking the child and, in consequence, Mr. Dayries was guilty of no negligence H: * * ”
The record fully justifies the above quoted conclusion and the judgment appealed from is, therefore, affirmed.
Judgment affirmed.